UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TELLY ROYSTER, | : | |
| | : | |
| Plaintiff, | : | CIVIL NO. 3:CV-05-2063 |
| | : | |
| v. | : | (Judge Caputo) |
| | : | |
| Secretary BEARD, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

Presently pending before the Court is Defendants' Motion for Summary Judgment (Doc. 115). For the reasons set forth below, the Motion will be denied.

## BACKGROUND

**I.  Relevant Procedural History**

Plaintiff Telly Royster, an inmate presently confined at the Huntingdon State Correctional Institution ("SCI-Huntingdon") in Huntingdon, Pennsylvania, initiated this action *pro se* by filing a civil rights complaint pursuant to the provisions of 42 U.S.C. § 1983.

He subsequently filed an amended complaint (Doc. 23) in which he named three categories of Defendants. The first category consists of Jeffrey A. Beard, Ph.D., Secretary of the Department of Corrections ("DOC"); Superintendent Donald L. Kelchner; and Teresa Law, Corrections Health Care Administrator ("Administrative Defendants").

The second category consists of the following corrections officers at Camp Hill State Correctional Institution ("SCI-Camp Hill"): Captain Daniel Orwig; Lieutenant Nick G.

Rodites; Lieutenant Anthony Ross; Sergeant Steven E. Klinedinst; Sergeant Duncan; Officer Michael J. Cleaver; Officer Sanchez; Officer Adam Huber; Officer LeRoy Robinson; Officer Steven A. Spriggle[1]; Officer Michael Martin; Officer John R. Snook; Officer Bryan D. Stubbs; Officer Keith Fenstemaker; and Officer Daniel R. Leahman ("Corrections Defendants").

The final category consists of the following members of the SCI-Camp Hill medical staff: Nurse Monica Woodyard; Janeen Davis, RN; Danielle McGrath, LPN; Physician Assistant Colleen Newfield; and Physician Assistant Michael Spaeder ("Medical Defendants").

In his Amended Complaint, Plaintiff alleges that, while he was previously incarcerated at SCI-Camp Hill, he was assaulted by Defendants Huber, Cleaver, Rodites, Klinedinst, and Sanchez and that Defendants Spriggle and Fenstemaker watched the assault and failed to intervene. He also alleges that Ross, Duncan, and the Medical Defendants denied him medical treatment for the resulting injuries.

On September 24, 2007, the Court granted in part and denied in part the Motion to Dismiss filed on behalf of Defendants Beard, Kelchner, Cleaver, Huber, Klinedinst, Law, Leahman, Martin, Orwig, Robinson, Rodites, Snook, Spriggle, Stubbs and Woodyard. (Doc. 90.) Therefore, Plaintiff's claims against Defendants Martin, Snook, Kelchner, Beard, Orwig, Robinson, and Leahman that they deprived him of his basic human needs, violated

---

1.   On January 19, 2007, Defendants filed a Suggestion of Death as to Defendant Spriggle, which was served on Plaintiff. (*See* Doc. 64.) Plaintiff did not seek to substitute Spriggle's personal representative as a party to this action within 90 days of the filing of a suggestion of death pursuant to Fed. R. Civ. P. 25(a)(1). Therefore, he is now precluded from asserting a claim against Spriggle's estate, and Spriggle will be dismissed as a party to this action.

his right to due process, and conspired to cover up the violations of his constitutional rights have been dismissed, and these Defendants will be terminated as parties to this action.

On October 16, 2007, the Corrections Defendants filed an Answer (Doc. 98) to Plaintiff's Amended Complaint.  On January 10, 2008, a Motion for Summary Judgment was filed on behalf of Defendants Huber, Cleaver, Rodites, Klinedinst, Robinson, Spriggle, Stubbs, Lehman, Fenstemaker, Law, Woodyard, Davis, and McGrath.  (Doc. 115.)  A supporting brief (Doc. 116), Statement of Facts (Doc. 118), Appendix (Doc. 117), and videotape filmed on July 3, 2004 also were filed.  Following a request for an extension of time, which was granted (Doc. 123), on February 14, 2008, Plaintiff filed his opposition brief (Doc. 125) and Statement of Facts (Doc. 127).  Therefore, the Motion is ripe for disposition.

## II.    Statement of Facts

Plaintiff alleges the following facts in his Amended Complaint (Doc. 23) and in his opposing Statement of Facts (Doc. 126):

On July 3, 2004, at approximately 7:45 a.m., Defendant Cleaver informed Royster that he would be last for the shower.  (Doc. 23 ¶ 11.)  Cleaver then approached Defendants Rodites, Klinedinst, and Sanchez, they exchanged words, and they all began smiling and nodding their heads up and down.  (*Id.* ¶ 12.)

Approximately fifteen to twenty minutes later, Rodites, Klinedinst, Cleaver, Sanchez, and Huber came to Royster's cell to escort him to the shower.  (*Id.* ¶ 13.)  Cleaver handcuffed Royster with the waist chain connected to the handcuffs and directed Royster to back into the cell when the door opened.  (*Id.* ¶ 14.)  When the door opened, Huber took

the waist chains from Cleaver, punched Royster in the mouth, and then pushed Royster on the bed.  (*Id.* ¶ 15; Doc. 126 ¶ 25.)

Roodites, Klinedinst, Cleaver, and Sanchez then rushed into the cell and began to repeatedly punch Royster's upper body area with closed fists.  (Doc. 23 ¶ 16; Doc. 126 ¶ 28.)  Rodites and Klinedinst hit Royster with batons.  (Doc. 23 ¶ 16; Doc. 126 ¶ 28.)  Huber also continued to assault Royster.  (Doc. 23 ¶ 16.)

They then pushed Royster to the floor and stomped and kicked him.  (*Id.* ¶ 17.)  Royster pleaded with them to stop.  (Doc. 126 ¶ 28; Ex. F-1, Affidavit of David Brown, at 38; Ex. F-2, Affidavit of Hubert Jackson, at 39; Ex. F-3, Affidavit of Artemio Jimnez, at 40.)  The repeated blows to Royster's head at one point rendered him unconscious.  (Doc. 23 ¶ 18.)  Royster was hit on the front and back of his head, face, eyes, nose, ears, crotch, arms, wrists, chest, back, and neck.  (*Id.* ¶ 19.)  Royster remained handcuffed throughout the assault.  (*Id.* ¶ 24.)  The assault lasted for approximately fifteen minutes.  (*Id.* ¶ 22.)

Royster suffered the following injuries as a result of the assault:

- swelling and bruising on the back of his head, right side of forehead, eyes, nose, ears, left arm, wrists, chest
- open wounds on his left arm, left ear, left eye, right eye, nose, left wrist, left hand, and right wrist
- migraine headaches
- memory lapses
- blurry vision
- sensitivity to light
- stuttering spells
- nausea
- chest pains
- dizziness
- stiff neck
- pain while urinating
- numbness on both wrists and hands

(*Id.* ¶ 20.)

Following a previous incident on May 19, 2004, a card was placed on Royster's cell door with the word "camera" on it to indicate that when his door was opened for any reason, a corrections officer was to be present with a handheld video camera to record whatever occurred.  (Doc. 126 ¶ 16; Exhibit D-1, Decl. of Anthony Sides, at 28.)  Defendant Fenstemaker was present with a handheld video camera recording the entire incident from the time Huber handcuffed Royster until after Defendant Woodyard took pictures of Royster's injuries, and he never attempted to intervene.  (Doc. 23 ¶¶ 21, 24; Doc. 126 ¶¶ 29, 35, 37, Ex. F-1 at 38; Ex. F-2 at 39; Ex. F-3 at 40.)  Defendant Spriggle also watched the incident without attempting to intervene, and while walking away from Royster's cell following the incident, he patted Sanchez on the back and said, "You really kicked his ass." (Doc. 23 ¶ 21; Doc. 126 Ex. F-3 at 40.)

Following the assault, Woodyard arrived with a digital camera and took pictures of Royster's injuries, but she did not administer any emergency medical treatment.  (Doc. 23 ¶ 23.)

When the shift changed at 2:00 p.m. on July 3, 2004, Royster informed Defendant Ross that he needed medical attention.  (*Id.* ¶ 25.)  Ross refused to call the medical staff and stated, "So you ain't tough shit after all, I heard they fucked you up but now I see it I believe it."  (*Id.*)

When the shift changed again at 10:00 p.m. on July 3, 2004, Royster informed Defendant Duncan that he needed medical attention.  (*Id.* ¶ 27.)  Duncan replied: "What

the fuck did you do?  If I could I would help but I have my orders and I'm not losing my job over you."  (*Id.*)

During the evening pill line on July 3, Royster and several other inmates informed Defendant Davis that Royster was in need of medical attention, and she stated that she would return, but she never did.  (*Id.* ¶ 26; Doc. 126 ¶ 81.)

On July 4, 2004 during the morning pill line, Royster again requested medical attention from Defendant McGrath.  (Doc. 23 ¶ 28.)  McGrath's response to Royster's request was that "they" would not let her treat him.  (*Id.* ¶ 28.)

On July 6, 2004 during sick line, Royster informed Defendant Spaeder that he had been assaulted and needed medical care.  (*Id.* ¶ 29.)   Spaeder did not examine Royster, but instead attributed his injuries to "sinus," and prescribed Motrin even though he was aware from Royster's medical file that he is allergic to it.  (*Id.*; Doc. 126 ¶ 88.)

On July 14, 2004 during sick line, Defendant Newfield informed Royster that she had "orders from the top not to do anything."  (Doc. 23 ¶ 30; Doc. 126 ¶ 95.)  Newfield told Royster that she could see that he needed medical care, but that she could not go against what she was told.  (Doc. 23 ¶ 30; Doc. 126 ¶ 95.)

Royster submitted requests for medical care to Defendant Law on July 6, July 15, July 19, August 4, August 17, September 10, and September 23, 2004, but she did not respond.  (Doc. 23 ¶ 31.)

The following version of events set forth by Defendants in their Statement of Facts (Doc. 118) differs markedly from Royster's:

On July 3, 2004 at approximately 8:00 a.m., Royster was scheduled to take a shower. (Doc. 118 ¶ 15.)  At that time, there was no order in place that Royster be photographed anytime that he was removed from his cell.  (*Id.* ¶ 16.)  In order to prepare to escort Royster to the shower, Cleaver opened the food panel in the cell door, and Royster put his hands through the opening so that handcuffs attached to a waist chain could be applied to him.  (*Id.* ¶ 18.)  Cleaver then applied the handcuffs.  (*Id.* ¶ 19.)  Because Royster was on waist chain restriction, the handcuffs were applied in the front.  (*Id.* ¶¶ 17, 20.)  While Royster was being handcuffed, Sanchez held the waist chain.  (*Id.* ¶ 21.)

The cell door was opened approximately ten inches.  (*Id.* ¶ 22.)  Cleaver took control of the waist chain from Sanchez and began passing it to Huber.  (*Id.* ¶ 23.)  Huber reached into Royster's cell with his right arm to take control of the waist chain from Cleaver.  (*Id.* ¶ 24.)  As Huber was reaching into the cell, Royster grabbed Huber's right arm and wrist, thereby pulling him into the cell.  (*Id.* ¶ 25.)  Huber ordered Royster to let go of his wrist, but he did not comply and continued pulling Huber into the cell.  (*Id.* ¶¶ 26, 27.)  Cleaver, Sanchez, and Klinedinst then entered the cell to restrain Royster.  (*Id.* ¶ 28.)

Rodites ordered Fenstemaker to retrieve a camera and begin filming the incident.  (*Id.* ¶ 29.)  Rodites supervised the other officers as they restrained Royster.  (*Id.* ¶ 30.)  While the officers were trying to restrain Royster, he first landed on his bunk, and then the officers secured him on the floor.  (*Id.* ¶ 31.)  Klinedinst, assisted by Huber, applied leg shackles to Royster.  (*Id.* ¶ 32.)  Cleaver held the waist chain and tried to restrain Royster's

midsection.  (*Id.* ¶ 33.)  During the restraining process, Royster was resistant and was squirming, kicking, and punching the officers.  (*Id.* ¶ 34.)

Fenstemaker arrived with the camera and began filming the incident at approximately 08:12 hours, which was after the officers had secured Royster on the floor.  (*Id.* ¶¶ 35, 37.)  There is a gap on the videotape from approximately 08:16:23 to 8:16:48.  (Doc. 117 Ex. A, Videotape of July 3, 2004.)   In his incident report, Fenstemaker states that he was changing the battery on the videotape during this approximately 25 second time gap.  (Doc. 118 ¶ 40.)

Defendant Woodyard arrived at Royster's cell at 08:14:15.  (Doc. 117 Ex. A, Videotape of July 3, 2004.)  Woodyard noted a cut approximately one inch in length on the mid-ulnar side of Royster's left forearm.  (Doc. 118 ¶ 43.)  She cleaned the cut and applied Bacitracin© to the area.  (*Id.* ¶ 44.)  After Woodyard completed her examination, the officers removed the shackles and secured Royster's cell door.  (*Id*. ¶ 46.)  The officers then removed the handcuffs and waist chain from Royster.  (*Id.* ¶ 47.)  Woodyard photographed the cut on Royster's forearm through the cell door and, at Royster's request, she photographed his eyebrow and cheek even though she did not observe any injuries there.  (*Id.* ¶ 45; *see* Doc. 117 Ex. A.)

Defendant Davis has no recollection of Royster complaining of any injuries to her during pill line on the evening of July 3, 2004.  (Doc. 118 ¶¶ 73, 74.)  Defendant McGrath also has no recollection of Royster complaining of any injuries to her during pill line on the morning of July 4, 2004.  (*Id.* ¶ 76.)

When Defendant Spaeder examined Royster on July 6, 2004, he noted "old" bruises on the wrists. (*Id.* ¶ 88.) Spaeder did not observe any bleeding upon his examination of Royster three days after the incident. (*Id.* ¶ 89.)

On July 14, 2004, eleven days after the incident, Defendant Newfield saw Royster. (*Id.* ¶ 94.) Royster complained that the Motrin that he was given was not helping his pain from the alleged assault and also complained about eye sensitivity since the alleged assault. (*Id.* ¶ 95.) Upon examination of Royster's eye, Newfield observed no contusions, subdermal hematoma, infections, edema, or other injuries, and noted EOMI (Extraocular Movements Intact) and PERRLA (Pupils equal, Round, Reactive to Light and Accommodation). (*Id.* ¶ 96.) Newfield advised Royster to submit a request to see the eye doctor. (*Id.* ¶ 97.) The SOAP (Subjective, Objective, Assessment, Plan) Notes do not reflect that Royster requested to see an eye doctor, but they do reflect that, on December 28, 2004, Royster was examined by Dr. James Weyand, O.D. in a routine optometry clinic. (*Id.* ¶ 98.)

On July 16, Newfield again saw Royster, who reported that Tylenol was not helping his headaches, rib pain, and neck pain. (*Id.* 99.) Newfield observed Royster moving "normally" in his cell and did not observe any injuries. (*Id.* 100.) Royster disputes that Newfield saw him after July 14, 2004 for medical care related to the injuries he sustained from the July 3 incident. (Doc. 126 ¶ 99.)

9

**LEGAL STANDARD**

Summary judgment will be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 249. In considering a summary judgment motion, inferences from the underlying facts must be viewed in the light most favorable to the non-moving party. *P.N. v. Clementon Bd. Of Educ.,* 442 F.3d 848, 852 (3d Cir. 2006).

The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 256-57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Accordingly, the non-moving party "may not rest upon the mere allegations or denials of the . . . pleading," but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (citations omitted). Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. *Versarge v. Township of Clinton*, 984 F.2d 1359, 1370 (3d Cir. 1993). Allegations made

without any evidentiary support may be disregarded. *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000).

In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Further, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Id.* at 255.

## DISCUSSION

### I.    Excessive Use of Force Claim

The use of excessive force against prisoners may constitute cruel and unusual punishment in violation of the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). The Eighth Amendment protects inmates from "unnecessary and wanton infliction of pain." *Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citations and internal quotations omitted)). In general, conduct that reaches the level of cruel and unusual punishment is "repugnant to the conscience of mankind" and "inconsistent with contemporary standards of decency." *Whitley*, 475 U.S. at 327 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103, 106 (1976)).

Even though a plaintiff need not allege a serious injury to state a claim, the Eighth Amendment does not protect against reasonable uses of force. *Hudson*, 503 U.S. at 7, 9-10. "[T]here is no constitutional violation for 'de minimis uses of physical force, provided

that the use of force is not of a sort repugnant to the conscience of mankind.'" *Brooks v. Kyler,* 204 F.3d 102, 107 (3d Cir. 2000) (quoting *Hudson,* 503 U.S. at 9-10).  However, the degree of injury, if any, is a relevant factor in the determination of the excessiveness of the force used.  *See id.* at 106.

When an inmate plaintiff raises an excessive force claim, the core judicial inquiry is "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  *See id*. (quoting *Hudson*, 503 U.S. at 7.) The following factors guide this inquiry:

> (1)'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them' and (5) 'any efforts made to temper the severity of a forceful response.'

*Id.* (quoting *Whitley*, 475 U.S. at 321).

In this case, Royster alleges that, after Cleaver handcuffed him with the waist chains connected and the door to his cell was opened, Huber took the waist chains from Cleaver, punched Royster in the mouth, and pushed him onto the bed.  (Doc. 23 ¶¶ 14-15.)  He further alleges that the assault by Huber, Cleaver, Rodites, Klinedinst, and Sanchez ensued.  (*Id.* ¶ 16.)  There is no dispute that Cleaver handcuffed Royster and that he remained handcuffed the entire time.[2]  Royster disputes Defendants' version of events in

---

2.   In their Answer to Plaintiff's Amended Complaint, the Corrections Defendants admit the following allegation by Plaintiff:

> 24) Upon information and belief from the time CO Cleaver handcuffed me until after Nurse Woodyard took pictures of the injuries CO John Doe

which Huber reached into Royster's cell to take the waist chain from Cleaver after Cleaver had handcuffed Royster, and Royster grabbed Huber's right arm and pulled him into the cell through the cell door, which Defendants allege was open only ten inches.  (*See* Doc. 118 ¶¶ 22-27.)  He further denies that he resisted the officers such that he needed to be restrained, but instead alleges that he pleaded with them to stop.  (Doc. 126 ¶ 28.)  In support of this allegation, Royster has submitted the Affidavits of inmates Brown, Jackson, and Jiminez stating that they heard Royster pleading with the officers to stop assaulting him and that other inmates also were yelling at them to stop.  (*See* Doc. 126 Ex. F-1, Affidavit of David Brown, at 38; Ex. F-2, Affidavit of Hubert Jackson, at 39; Ex. F-3, Affidavit of Artemio Jiminez, at 40.)

In accepting these allegations as true, and in drawing all reasonable inferences in favor of Royster, it is apparent that he has established that there is a genuine issue of material fact as to whether the application of force was applied in an attempt to restore discipline, or maliciously and sadistically to cause Plaintiff pain.  *See Hudson*, 503 U.S. at 7.  Because this Court cannot determine the credibility of either party's statements at this

---

> [Fenstemaker] was present with a handheld video camera recording everything that occurred.  Emphasis added I WAS HANDCUFFED THE ENTIRE TIME.

(*See* Doc. 23 ¶ 24; Doc. 98, Corrections Defendants Answer to First Amended Complaint, ¶ 24.)

stage in order to resolve that issue of fact, Defendant's Motion for Summary Judgment will be denied as to Plaintiff's excessive force claim.[3]  *See Anderson,* 477 U.S. at 249, 255.

## II.   Deliberate Indifference Claim

In order to establish an Eighth Amendment claim against a defendant for inadequate medical care under § 1983, a plaintiff must show "(I) a serious medical need, and (ii) acts or omissions . . . that indicate deliberate indifference to that need." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *see also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would recognize the need for a doctor's attention.  *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).  In addition, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment."  *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

"An inmate can show deliberate indifference where, for example, prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering."  *Goodrich v. Clinton County Prison*, 214 Fed. Appx. 105, 111 (3d Cir.

---

3.   Defendants submitted a videotape in support of their Motion, which the Court has viewed.  The video begins at 08:12 hours, and thus it does not show the events that occurred when the officers arrived at Royster's cell to escort him to the shower.  It portrays the officers holding Royster down in his cell, the arrival of Defendant Woodyard, the officers securing Royster in his cell before exiting, and Woodyard taking pictures of Royster through the cell door.  As such, it does not aid the Court in determining whether or not the force that was used was excessive.  Further, contrary to Defendants' argument, the video is not helpful in evaluating the extent of Plaintiff's injuries because he is never fully visible.

2007) (citing *Lanzaro*, 834 F.2d at 346) (internal quotation and citation omitted)).

"Alternatively, deliberate indifference is shown where knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care or where prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to [a] physician capable of evaluating the need for such treatment." *Id.* (citing *Lanzaro*, 834 F.2d at 346-47) (internal quotations and citations omitted)). Moreover, the issue as to whether a defendant's conduct amounts to deliberate indifference is a question to be resolved by the fact finder. *Id.* (citing *A.M. ex. rel. J.M.K. v. Luzerne County Juvenile Detention Ctr.*, 372 F.3d 572, 588 (3d Cir. 2004) (internal quotation omitted)).

While Royster asserts claims of deliberate indifference against Defendants Woodyard, Ross, Davis, McGrath, Spaeder, Newfield, and Law, only Defendants Woodyard, Davis, McGrath, and Law are among the Defendants who have joined in the instant Motion for Summary Judgment.[4] The Court will address the allegations against these Defendants in turn.

As to Defendant Woodyard, Royster disputes her contention that she treated a cut on his arm. Royster agrees that Woodyard took photographs, but he denies that she provided him with medical care. (Doc. 23 ¶ 23.) Moreover, the videotape submitted by Defendants does not resolve the issue. The video shows Woodyard standing over Royster with her

---

4. The docket reflects that Defendants Spaeder and Newfield are represented by Alan S. Gold, Esquire. Defendant Ross is not represented and has failed to answer Plaintiff's Amended Complaint. Attorney Rand was permitted to withdraw her appearance on Ross's behalf by Order dated December 19, 2007. (*See* Doc. 112.)

back to the camera appearing to examine him, but because Royster's body is blocked by the officers holding him down, it is not possible to observe whether Woodyard administered medical care.  Also, Woodyard is present in the cell before the time gap occurs on the tape at 8:16:23, but she is no longer there when the tape resumes at 8:16:48, and therefore, her actions during that time are not portrayed.

With regard to Defendants Davis and McGrath, both submitted Affidavits stating that they do not remember Royster complaining about any injuries during pill line on July 3 and 4, but that if Royster sought care for his injuries, it would be contrary to their job requirements and nursing licensing standards not to refer Royster to a physician's assistant or doctor.  (Doc. 117 at 146-149.)  Royster alleges that he asked both Davis and McGrath for medical help for his injuries, but that Davis ignored the request and McGrath explained that she was directed not to provide medical care.  (Doc. 23 ¶¶ 26, 28.)  In support of his allegation, Royster has submitted the Affidavits of inmates Baker and Bradley in which they state that they asked Davis to help Royster and witnessed other inmates ask her also, and Davis said that she would get help, but she never returned.  (Doc. 126 Ex. J1, Affidavit of Raqeeb Baker, at 48; Ex. J2, Affidavit of Raymond Bradley, at 49.)  Baker and Bradley also state that they witnessed McGrath tell Royster during the morning pill line on July 4 that the guards would not let her provide Royster with medical treatment.  (*Id.*)

As to Defendant Law, Royster alleges that he submitted numerous requests for medical treatment on July 6, July 15, July 19, August 4, August 17, September 10, and September 23, 2004, but she did not respond.  (Doc. 23 ¶ 31.)  In their Answer to Royster's Amended Complaint, Defendants deny this allegation, and by way of further answer, state

that, to the best of her recollection, Law responded to all of Plaintiff's requests and grievances. (Doc. 98 ¶ 31.)

The injuries Royster alleges he sustained as a result of the July 3, 2004 are serious in nature. A genuine issue of material fact exists as to whether Royster's requests for treatment were ignored such that Defendants Woodyard, Davis, McGrath, and Law were deliberately indifferent to his serious medical needs.[5] Accordingly, Defendants' Motion for Summary Judgment will be denied as to Royster's deliberate indifference claim.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment will be denied.

The Clerk of Court will be directed to terminate Defendants Martin, Snook, Kelchner, Beard, Orwig, Robinson, and Leahman as parties to this action because the claims against them previously were dismissed. The claims Defendant Spriggle also will be dismissed because Plaintiff is precluded from asserting a claim against his estate.

---

5.   In an apparent attempt to show that Royster was provided with the opportunity to receive medical care from a doctor but refused it, Defendants include in their Statement of Facts that, on July 12, 2004, Royster was seen by William Young, M.D. on sick line. (Doc. 118 ¶ 91.) They state that Royster complained of headaches and sore ribs on his left side, but refused to exit the cell to be examined by Dr. Young. (*Id.* ¶¶ 92, 93.)

In opposing these facts, Royster alleges that he did not refuse to be examined, although he would have been justified in doing so in light of the fact that the officers who came to escort him to be examined by Dr. Young were the same officers he alleges assaulted him. (Doc. 126 ¶ 93.) Dr. Young's notation does not indicate that Royster refused to see him directly, but rather states "staff reports inmate refused to come out of his cell for an exam." (Doc. 117 at 164.) Because it is not clear that Royster refused treatment, Defendants have not demonstrated that there is no genuine issue of material fact as to whether they were deliberately indifferent to Royster's serious medical needs.

An appropriate Order follows.


August 15, 2008                                s/ A. Richard Caputo
                                               A. RICHARD CAPUTO
                                               United States District Judge

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TELLY ROYSTER, | : |
| Plaintiff, | : CIVIL NO. 3:CV-05-2063 |
| v. | : (Judge Caputo) |
| Secretary BEARD, *et al.*, | : |
| Defendants. | : |

## ORDER

**NOW, THIS 15th DAY OF AUGUST, 2008,** in accordance with the foregoing Memorandum, **IT IS HEREBY ORDERED AS FOLLOWS:**

1. The Motion for Summary Judgment (Doc. 115) filed on behalf of Defendants Huber, Cleaver, Rodites, Klinedinst, Robinson, Spriggle, Stubbs, Lehman, Fenstemaker, Law, Woodyard, Davis, and McGrath is **DENIED**.

2. The Clerk of Court shall terminate the following Defendants as parties to this action: Spriggle, Martin, Snook, Kelchner, Beard, Orwig, Robinson, and Leahman.

3. A status and scheduling conference will be scheduled at the convenience of the Court.

                     s/ A. Richard Caputo
                     A. RICHARD CAPUTO
                     United States District Judge